M. M. TOMPKINS, Administrator of the Estate of P. L. MINER, Deceased, *v.* E. J. WEEKS, J. S. JOHNSTON, and H. MORRISON.

Creditor may contest Account of Administrator.—A creditor of a deceased person is interested in his estate, and is entitled to appear in the Probate Court · and file objections in writing to the account of an administrator, and to contest the same.

Creditors contesting Administrator's Account.—Where the contestants to an administrator's account stated in their exceptions that they were creditors of the deceased, and they were allowed to contest by the Probate Court, and the administrator appealed, but the transcript did not show that any proof was introduced on the subject of their being creditors, the presumption is that the Probate Court acted correctly.

Administrator — Advances by. — If an administrator advance money to pay off a mortgage debt upon land for which the estate is not liable, because the estate has a junior mortgage upon the same land, and in order to relieve the land from the older mortgage and let in the younger mortgage of the estate, and a loss thereby ensues, the Probate Court cannot allow him in his account for any portion of the loss sustained by the advancement thus made.

Accounts of Administrators.—If there is a debt due the estate of a deceased person, secured by a mortgage on land, and another person has a prior mortgage on the same land, and the administrator, in good faith, and under the belief that the land is worth the amount due on both mortgages, forecloses the mortgage owned by the estate, and bids in the land for the amount due on both mortgages, and advances the money to pay the prior mortgage, or uses money of the estate

for that purpose, the Probate Court cannot allow him, in his account, a credit for the money lost by the purchase if the land proves to be of less value than the amount paid to discharge the prior mortgage. If the lands thus purchased are regarded as assets of the estate, the loss cannot be determined until sold by order of the Probate Court. If, however, the creditors and heirs repudiate the purchase, and charge the administrator with the entire amount paid, the land will belong to the administrator.

ADMINISTRATOR AND SURVIVING PARTNER OF DECEASED.—The administrator has no authority nor has the Probate Court any power to authorize him to advance money, or use funds belonging to the estate for the purpose of carrying on business with the surviving partner of the intestate, and if he does so, and loss thereby accrues to the estate, he cannot be allowed for the same in his account. The administrator has no authority to intermeddle with partnership affairs, except to call upon the surviving partner to close up the same and account to him.

SAME.—Neither the administrator nor the Probate Court have any power to change the order in which the debts of the estate are directed to be paid by the Act relating to the estates of deceased persons, and an order of the Probate Court, made with the consent of the administrator, directing him to pay partnership debts, before the debts of the estate are paid, is void, and if he obey the same he cannot be allowed in his account the money used until all the debts of the estate are paid.

APPEAL from the Probate Court, Tehama County.

Weeks, Johnston, and Morrison stated in their written exceptions to the account of the administrator that they were creditors of the deceased. The contestants appealed from the order of the Probate Court allowing the items objected to.

The other facts are stated in the opinion of the Court.

*W. H. Rhodes,* for Appellants.

*Eugene Casserly,* also for Appellants.

The order of August 5th purports to authorize the administrator to pay "out of the private funds" of the estate of Miner, deceased, five thousand dollars to the surviving partner, for the purpose of "liquidating certain obligations of the firm," made before Miner's decease, "and to increase the capital stock of said firm," etc.

Such an order was not within the jurisdiction of the Probate Court, on several grounds.

If the purpose was (as is held out by the language employed) to pay off certain debts of the firm of Miner & Jaynes, growing out of contracts of the firm before Miner's decease, such

debts could only become a charge against the estate in the event of the insolvency of the surviving partner, who, having the assets, was of course alone liable for them in the first place. (*Lawrence* v. *Trustees, etc.*, 2 Denio, 577 ; S. C. [below] 11 Paige, 80 ; *Bloodgood* v. *Bruen*, 4 Seld. 362, 369, 371 ; *Voorhies* v. *Childs*, 17 N. Y. 354, 355–7, examining all the authorities.) With the debts due by the firm, the executor has no concern and no right to intermeddle in the matter. (4 Seld. 369, 370.)

In that event, (the surviving partner's insolvency,) the Probate Act has prescribed a mode of payment by special provisions, under which all creditors of an estate are required to make presentation and proof of their claims, whether contingent or absolute, for allowance by the administrator and Probate Judge, and upon rejection to prosecute the same in a District Court. (Prob. Act, Secs. 130, 132, 134, 244.)

It is not "within the jurisdiction" of a Probate Court or Judge to act upon a claim or debt against an estate, or allow or authorize the payment of it by an administrator, in any other manner. Consequently, in this aspect, the order of August 5th was a mere nullity.

The purchase of the land at the mortgage sale, and all the transactions connected with it, the loan, the allowance of the credits in the accounts, etc., were illegal and unauthorized, and beyond the power of the Court, or of the administrator.

There is probably no case in which an executor can lawfully make a purchase of property, except where the transaction is necessary for the protection of the estate, and at the same time involves it in no expenditure or liability; as where, upon a foreclosure sale, the executor holding the first or only mortgage, and the property being probably about to sell for a sum far below its value, and below the amount due on the mortgage, he bids it in for the benefit of the estate, and holds it precisely as he had held the mortgage. That was the case in *Clark* v. *Clark*, 8 Pai. 152, 157–8, relied on by respondent's counsel.

That, however, was very far from being the case in hand.

Here the administrator held the second mortgage, and undertook to buy in the property and pay off a prior mortgage for two thousand nine hundred and thirty dollars and ninety-four cents, part of which he had to borrow; while it does not appear that such a step was necessary for the protection of the estate, or has been of any benefit to it, or that the property sold below its value. But, on the contrary, it appears from the administrator's own testimony, that it brought more than it was worth. (*Wilcox* v. *Smith*, 20 Barb. 340, 341.)

*Jennison* v. *Hapgood*, 10 Pick. 77, is also relied upon by respondent's counsel. In that case it was held that where an executor, not having assets, advances his own money to redeem land of his testator mortgaged for less than its value, and to prevent a foreclosure, he is entitled to interest on his advances. But the material facts in that case which distinguishes it from this is, that the executor had paid out his own money and taken the title to himself and another as his agent, who afterwards conveyed to him, and the only question was whether the sale should be vacated for the benefit of the testator's heirs, upon refunding to the executor his advances with interest. (Ib. 91, 92, 101.)

The very most that can be claimed in favor of the administrator is, that in a proper proceeding had either in the Probate Court, or more probably in chancery, as indicated in *Knight's Estate*, 12 Cal. 208, he should be allowed to sell the property thus purchased by him without authority, and apply the proceeds, less the amount of the Toomes' mortgage, as assets of the estate; leaving the question of protection to him in case of loss upon such sale to be then settled upon a proper showing between him and all the parties in interest. (8 Pai. 157–8; *Rosseter* v. *Cossit*, 15 N. H. 38, 42–45; *Wilcox* v. *Smith*, 26 Barb. 316, 340, 341, 354, 355.)

*George Cadwalader*, for Respondent.

In the consideration of the question now under examination, it will be seen that the purchase of the mortgaged property, and the payment of the Toomes' mortgage, was one of those

common transactions illustrated every day in business communities, that as yet no loss has accrued to the estate therefrom, and that the property purchased is now part of the assets of the estate, and as such, liable to the jurisdiction of the Probate Court as any other property belonging to said estate. (4 Edwards' Ch. 718.)

While it is true that the act of purchase was without antecedent authority from the Probate Court, and the administrator acted at his peril in making the purchase, still, the subsequent ratification of the Probate Court was equivalent to previous authority vested in the administrator to make the purchase.

The "Estate Act" does not pretend to define the powers and duties of administrators or executors in all cases, nor of the Probate Court. The "control and preservation of estates," is given to the former, subject to the supervision of the latter.

In Dayton on Surrogates, page 483, it is remarked that: "An executor, however, is only required to manage the estate in his charge as a prudent man would his own; and in case of loss, the question of liability depends upon the particular circumstances of the case. He is not chargeable with the consequences of a disastrous exercise of his discretion, unless accompanied with such negligence as raises a presumption of wilful misconduct."

In *Jennison* v. *Hapgood*, 10 Pickering, 78, it was decided: "That if an executor not having assets advances his own money to redeem land of the testator, mortgaged for less than its value, and to prevent a foreclosure, he is entitled to interest on the money advanced."

Our statute does not contain a prohibition against the exercise of power not granted. Nor are the powers of the Probate Judge defined with any precision, while the majority of acts which every administrator is called upon to perform are not expressly warranted by the statute.

At his peril he pays taxes, insurance, and the costs of repairs, assessments on stock belonging to the estate, invests the surplus money thereof, and does a hundred other things necessary to preserve the estate, without being able to point to the sec-

tion of the statute which gives him express authority so to do. The Probate Court, reviewing these and kindred acts of the administrator, considers not the question of power, or want of power, but satisfies itself whether the payments were necessary to preserve the estate, and whether the administrator, in making them, acted in good faith. Satisfied on these points, the payments will be allowed.    (3 Bradford, 13.)

Executors are not liable for the loss of funds of the estate, if they act with ordinary diligence; nor for the mismanagement or insolvency of their agents which they could not foresee or control.    (6 Watts, 485.)

Payments made by executors or administrators in good faith, will be allowed.    (6 Greenleaf, 127; 10 Pickering, 77; 2 Ashmead, 437; 11 Harris, 95.)

"Executors will be justified in pursuing a course which a judicious man would do under the same circumstances, looking alone to his worldly interests." (*Kee* v. *Kee*, 2 Grattan, 116.)

Guided by principle or authority, the Court will declare that the administrator was justifiable in making the purchase, and paying off the Toomes mortgage, and that the order of the Probate Court was correct affirming the act of the administrator.

We now propose to consider the question whether the Probate Court had the power to make the order of May 5th, 1861, directing the administrator to pay the surviving partner the sum of five thousand dollars.

The appellants make it a question of a naked want of power; not contending that the advance was injurious to the estate or the creditors thereof.

Indifferent observation will detect a great difference between this power and one which orders a payment that directly diminishes the assets of an estate. Here the power invoked was one that tended to preserve and increase the value of the estate, to the manifest advantage of both heirs and creditors, while the argument of appellants' counsel assimilates it to a power that would authorize the Probate Court to direct the

payment to persons having no claims upon the estate of large sums of money, to the direct detriment of both heirs and creditors—and in this lies the vice of appellants' argument—most fully proved by the objects of and the consequences which result from the exercise of these widely variant powers.

Executors and administrators are charged with the value of all property embraced in the inventory, and by the one hundred and ninety-eighth section of the Estate Act, the interest of a decedent in a firm is required to be "appraised and inventoried as other property," but to the surviving partner is given the right to continue in possession of the effects of the copartnership, and to settle its business, subject to the surveillance of the Probate Judge, and to the administrator is given authority to maintain any action against him that his intestate could.

The administrator is therefore to see that the surviving partner does not abuse his trust by sacrificing or squandering the property of the firm, in which case it is the duty of the administrator to interfere and apply for a receiver to take charge of the assets and settle the business of the firm. Thus, Story on Partnerships, section three hundred and forty-eight, says : "The survivors are entitled to close up the affairs of the firm, to collect and adjust the debts due to it, and to pay its debts and discharge its liabilities. They are also bound to apply the partnership property to the like purposes with reasonable diligence. If they are negligent in the discharge of their duties in these particulars, Courts of equity will interfere, and upon the application of the representatives of the deceased partner, appoint a receiver, and order a sale of the partnership property, and wind up the affairs of the firm. (*Evans* v. *Evans*, 9 Paige, 178.)

Notice of an application for an order to heirs and creditors is only necessary when required by the Estate Act—in other cases it may be omitted. The Probate Judge makes numberless orders affecting the estate, without notice being given thereof.

Thus, under section one hundred and twenty-one, he sets

apart property exempt from execution; under section one hundred and twenty-two, makes the allowance for the family of the deceased; under section one hundred and thirty-two, he approves of claims against the estate; under section one hundred and fifty-two, he approves the sale of the personal property of the estate; under section two hundred and one, he orders a debt due the estate to be compounded. (Dayton, 283.)

By the Court, Sawyer, J.

On the 9th of October, 1862, the respondent, Tompkins, as administrator of P. L. Miner, deceased, filed his first annual account, and asked that a day for the settlement be appointed and his account allowed. A day having been appointed for the purpose, the appellants, Weeks, Johnston and Morrison, appeared and filed exceptions to certain items charged by the administrator in his account, alleging themselves to be creditors of the estate. The administrator objected to the filing of their exceptions, and moved to strike them out, on the ground "that it does not appear from said exceptions that said contestants, or either of them, is interested in the said estate;" which objection and motion was overruled. After an adjournment, the administrator again objected to "the contestants appearing, for the reason that neither of them come within the provisions of the statute authorizing persons to appear and contest administrator's accounts;" which objection was also overruled, and the respondents now insist upon these objections. Under sections two hundred and twenty-six and two hundred and thirty-four of the Practice Act, "any person interested in the estate may appear and file his exceptions in writing to the account, and contest the same." A creditor is interested in the estate within the meaning of these provisions. But it is insisted, that there was no proof that contestants were creditors—that it is not sufficient to allege in the exceptions, that they are creditors without proving the allegation. The point of the objection taken in the Court below, was not that there

8

was a defect of proof, or no proof. If that was the objection it should have been specified. The objection was, that " it does not appear from the exceptions," that contestants are interested—not from the proofs—and, that " neither of them come within the provisions of the statute," etc. The point of the objection evidently was, that a creditor is not entitled to contest. If it referred to proof, it does not appear whether any proof was introduced or not, or if so, what proof. If it related to a question of fact dependent on proof, the Court determined the fact against the respondent, and we cannot review its action without knowing whether it acted upon evidence or not, and if so, upon what evidence. There is nothing to show that the allegation of the interest of the contestants was controverted, and the presumption is, that the fact was correctly determined by the Court.

One A. G. Toomes held a mortgage on a rancho, executed by Alpaugh and Salisbury, for a part of the purchase money. The amount due on the mortgage July 26, 1862, including interest, etc., was two thousand nine hundred and thirty dollars and ninety-four cents. Alpaugh and Salisbury, in the lifetime of deceased, executed in his favor a second mortgage on said rancho to secure the payment of one thousand dollars borrowed money, and interest at three per cent per month, which sum, including interest, etc., on the said 26th day of July, amounted to two thousand two hundred and thirteen dollars and forty-four cents. One Hollister held a third mortgage. The administrator brought suit to foreclose the second mortgage, making the holders of the other mortgages parties. A judgment of foreclosure was entered, and the several sums above mentioned were directed by the judgment to be paid, in the order named. At the sale under the judgment, the administrator, with a view of protecting the estate, and on the supposition that the property was worth more than the amount due on the first mortgage, in good faith, but acting upon his own judgment, without any application to, or direction from the Probate Court, bid off the rancho at five thousand dollars. Not having cash in hand sufficient for the purpose, he borrowed a

considerable portion of the money at three per cent per month interest, with which to pay the amount due on the first mortgage. He paid the full amount, viz: two thousand nine hundred and thirty dollars and ninety-four cents. This item, thus paid upon his own responsibility, without any authority from the Probate Court, and the items of interest on the money borrowed to enable him to make the payment, are objected to by the contestants. The items were allowed, and the allowance is assigned as error. Alpaugh and Salisbury were insolvent at the time, and there was no prospect of making the money, unless it could be made out of the mortgaged property. The Court found as a fact, that the transaction was made by the administrator in good faith, believing it to be for the advantage of the estate; that the rancho, at the time of the purchase, was worth five thousand dollars, although the only witness (Toomes) who testified on this point stated, on cross-examination, that he did "not think the land would have sold for five thousand dollars." And it is pretty evident from the testimony, that it was not a very safe purchase at that amount.

It is insisted that an administrator is only required to manage the estate in his charge as a prudent man would his own; that in case of loss the question of liability depends upon the particular circumstances of the case; that he is not chargeable with the consequences of a disastrous exercise of his discretion, unless accompanied with such negligence as raises a presumption of wilful misconduct; that in this case no such negligence exists; that the administrator acted in good faith, and as a prudent man would have done in the management of his own affairs, and that he ought to be exonerated 'from the consequence of his error in judgment, if there be any; and upon this principle the Court below appears to have determined the question. But conceding, for the purposes of the argument, the principle to be correct, to render it applicable, the action of the administrator must be in a matter where the discretion exists. It must be an act which the law authorizes him to perform—one within the general scope of his powers as

administrator. An administrator has no right to speculate with the moneys belonging to the estate with the idea that he can make large profits, and greatly enhance its value. If he sees an opportunity where he can purchase a farm for five thousand dollars, which he is confident he can sell within a few days for ten thousand dollars, and makes the purchase with the funds of the estate, and it turns out to be a losing operation, he will be chargeable with the loss, no matter how pure his motives or how enticing the prospect may have been. He would urge in vain as a defense, that the property was well worth ten thousand dollars at the time; that careful business men regarded it as an excellent operation; that he acted in good faith with the confident and reasonable expectation that he should double the assets of the estate. Such an operation is not one intrusted by the law to his discretion. It is not within the general scope of his powers as administrator. And yet in what respect would such a transaction differ in principle from the one under consideration? *The prior mortgage of Toomes was not a charge against the estate. No part of it could ever have been paid out of the assets of the estate.* It is true, the estate held a subsequent mortgage, which might be utterly lost unless the mortgaged property could be made to pay it. But substantially, when reduced to its elements, the real, and only question with the administrator was, will it be a good speculation for the estate to buy the rancho at two thousand nine hundred and thirty dollars and ninety-four cents? Can I make for the estate by the speculation the sum of two thousand two hundred and thirteen dollars and forty-four cents, more or less? For it does not affect the principle in the least, whether he saves that amount of indebtedness which he would otherwise lose, or makes the same amount as an original speculation, pure and simple, by the use of the funds of the estate in the purchase of lands, where no indebtedness against, or charge upon the estate existed.

We have been referred to no case by the respondent—and we have been unable to find one—where an administrator has been exonerated from loss under similar circumstances, or upon

similar principles; on the contrary, the case of *Knight's Estate*, 12 Cal. 208, is directly in point the other way.

The facts disclosed by the record in that case are very nearly analagous to the facts in the case under consideration. As they are imperfectly stated in the report of the case, we state them very fully, as they appear in the record. They are as follows:

Knight in his lifetime purchased one undivided fifth of the Suscol Rancho. At the time of the purchase and of Knight's death, there was a mortgage upon the rancho for twenty-five thousand dollars. But Knight was not personally liable for the money secured. The interest of Knight's estate in the rancho was appraised at twenty-four thousand dollars. The mortgagee was threatening to foreclose, and the administrator, in good faith, thinking to promote and protect the interest of the estate, entered into an arrangement with the mortgagee, by which he was to pay in cash two thousand five hundred dollars, and interest on two thousand five hundred dollars more, making in all five thousand dollars, or one fifth of the whole, corresponding to the interest in the land held by the estate. The mortgagee, on his part, in consideration of the arrangement, agreed in writing not to foreclose as against the estate, until after the title should be confirmed by the Land Commissioners, before whom the claim was pending; and after such confirmation, upon the payment of the remaining two thousand five hundred dollars and interest, to release and discharge the entire mortgage as to the undivided fifth held by the estate. At the time of this arrangement the value of the interest of the estate had depreciated to twenty thousand dollars, but in the opinion of competent judges of real estate there was a prospect, and it was confidently expected, that it would soon largely appreciate again. The administrator paid the two thousand five hundred dollars, and continued thereafter to pay interest on the remaining sum due, in pursuance of the arrangement. The title was at length confirmed, but still the land continued to depreciate in value. The mortgagee, after the confirmation, again threatened to foreclose and sell,

to prevent which the administrator, by order of the Probate Court, sold the said property for three thousand five hundred dollars, that being the highest amount that could then be obtained. The sale was confirmed, and a portion of the proceeds sufficient for the purpose, by order of the Court, applied to the satisfaction of said remaining sum of two thousand five hundred dollars, due on the mortgage. The result was a loss of two thousand four hundred and sixteen dollars and sixty-seven cents, which sum the administrator claimed to have allowed, on the grounds that he had acted in good faith and as a prudent man would have done under the circumstances, and that the approval of the sale and application of the proceeds by the Probate Court was a ratification of his acts. On exception to this item the Probate Court refused to allow it, and the administrator appealed.

The principles applicable to such cases are so clearly and forcibly stated by Mr. Justice Baldwin in deciding the case that we quote his language at length. At page two hundred and seven he says: "This is unquestionably a hard case on the administrator, for he seems to have acted in good faith. But we cannot relax or set aside the rules of law to suit the exigencies of particular cases or relieve individual instances of hardship.

"The statutes of this State do not allow an administrator to pay even the debts due by an intestate, except in a particular way. Certainly they do not allow him to pay money not due by an intestate, upon an idea that the payment might be beneficial to the estate. He is to take care of, manage and preserve the estate committed to him; but this does not mean that he is, at discretion, to pay off all incumbrances resting on the property, upon the notion that the property may increase in value, and thereby a speculation may be made for the estate. If this were so, an administrator might consume all the assets of the estate in clearing the title to a portion of the property, and then the property might turn out to be valueless or worth but little. If a case should arise in which a great sacrifice would ensue unless money were paid to discharge an incum-

brance, it is not impossible that a Court of chancery might order the expenditure of the money needed to remove such incumbrance. The rule of equity is that a trustee has a right, in questions of responsibility and difficulty, to seek the direction of a Court of chancery, touching his conduct in the trust, and that the decree of the Court is a protection to him. But if he undertakes to go beyond the strict line of his duty as the law defines it, he acts upon his own responsibility, and while he can receive no profit from a successful issue of his investments he must bear the loss of a failure. It would be a most dangerous precedent to hold that an administrator may speculate with the funds of the estate, or pay charges not allowed by law, though solely with a view of benefiting the estate, and then throw the loss upon the estate, and assign his good intentions as a defense to the injurious consequences of his acts.

"The administrator, in the absence of special authority, must administer the estate as he finds it, paying taxes and other necessary expenses, and doing such other acts as are necessary to preserve it as left; he cannot advance money to remove incumbrances, unless his intestate was bound to pay the money. If he takes the responsibility of improving the estate or bettering the title in this way, it must be at his own risk. The loss cannot be visited upon the heirs who gave him no authority to cause it. Nor can he ask legal protection when he has himself, though with the best motives, gone beyond the provisions of the law."

The principles thus laid down are decisive of the question under consideration. This record certainly does not present a more meritorious case, than that in the matter of *Knight's Estate*. If there is a loss, then, it must fall upon the administrator.

But the lands purchased still remain in the hands of the administrator unsold, and are classed by him as a portion of the assets of the estate. If the creditors repudiate the purchase, and charge the administrator with the entire amount paid, the property purchased will belong to him. They can-

not compel him to sustain the loss of the entire amount paid, including interest, and also avail themselves of the lands purchased as assets of the estate. But if the lands are to be regarded and administered as assets, the condition of the estate is not yet such, as to enable the Probate Court to pass upon this item. It will be necessary to reserve the question till the lands are sold, and the amount of the actual loss ascertained.

At the time of Miner's decease, he was a partner with one Jaynes in the erection of a flouring mill. It does not appear what progress had been made in the enterprise at the time of intestate's death. On the fifth of August, several months after his decease, Jaynes, the surviving partner, presented to the Probate Judge of Tehama County a petition stating the partnership; that previous to Miner's decease the firm were engaged in erecting the flouring mill mentioned, and had entered into contracts for the construction thereof, which were still in force and binding upon the firm; that since the decease of Miner, petitioner had been engaged in erecting said mill and carrying out the contracts made by the firm in the lifetime of decedent; that the assets of the firm at the time of filing petition, including cost of mill thus far (forty thousand six hundred and four dollars) were sixty-two thousand two hundred and twenty-nine dollars and twenty-eight cents; that in erecting the mill and carrying out the contracts a larger amount of money had been required than he could realize from the sale of property of and collection of the debts due the firm; that to meet the obligations of the firm arising out of said contracts it was necessary to have immediately ten thousand dollars; that he could not collect the money, or borrow it except at high rates of interest; and that it was necessary to have this amount of money to protect the interest of the estate of decedent in the property of the firm. The amount of indebtedness of the firm is not stated. Upon these representations, he asks an order authorizing and directing the administrator to advance five thousand dollars out of funds of the estate to offset a like amount to be advanced by himself for the purpose specified. The administrator appends

an admission in writing that the matters stated in the petition are true, and consents that the order asked may be made. On the same day, without any citation to, or appearance by other parties interested in the estate, the Probate Judge, after reciting the matters set out in the petition, and the necessity of an appropriation, " ordered, that said administrator of said estate be and he is hereby authorized to pay and advance to said Samuel Jaynes, surviving partner, out of the private funds of said estate, the sum of five thousand dollars, for the purpose of liquidating obligations existing against said firm, growing out of contracts made by said firm before the decease of decedent.   *   *   *   The above sum of five thousand dollars is to offset against a like sum of five thousand dollars to be advanced by said surviving partner, and to increase the capital stock of said firm by the gross amount of said sums."

The administrator not having ready money of the estate in his hands, borrowed for the purpose a large amount on interest at three per cent per month, and paid over to Jaynes four thousand seven hundred and six dollars and fifty-three cents. Of this sum four thousand dollars were borrowed of one Hort, and a note for ten thousand dollars, secured by a mortgage on real estate was assigned as security, with the approval of the Probate Judge.   The sums thus borrowed and paid over to Jaynes, and interest paid on the money so borrowed, are items charged in the account of the administrator, and excepted to by the contestants.   At the hearing, the Probate Judge found that the borrowing of the money, payment of interest, etc., were necessary for carrying out the aforesaid order of the Probate Court in paying the sum of four thousand seven hundred and six dollars and fifty-three cents to Samuel Jaynes, surviving partner, and that the transactions were made by the administrator in good faith, and with a view of furthering the best interests of the estate.   These items were allowed, and contestants excepted.   The allowance is relied on as error.

If there are degrees in error, in our opinion these transactions of the administrator and Probate Court are less defensible than those already discussed.   Upon a very imperfect and

9

unsatisfactory showing, without notice to any of the parties interested in the estate, upon the request of the surviving partner and the consent of the administrator, upon the same day the petition was presented, the Court authorized and directed the administrator to pay to said surviving partner five thousand dollars out of the assets of the estate; and to enable him to carry out this order, authorized the administrator to borrow the money on interest at three per cent per month. The Court had no jurisdiction to make the order, and the administrator no authority to execute it. The partnership was dissolved by the decease of Miner. The partnership property was assets of the firm, and subject to the exclusive management and control of the surviving partner. It was not assets of the estate in the hands of the administrator. Only the share of the deceased in the residuum of the partnership assets, after the affairs of the partnership should be wound up and the debts paid, would be assets of the estate in the hands of the administrator.

The administrator had no authority to intermeddle at all with the partnership affairs, except so far as he was entitled to call upon the surviving partner to proceed and close up the partnership affairs and account to him for the share of the surplus belonging to the estate. The authority of the administrator only extended to settling up the affairs of the estate, paying the debts and distributing the remainder, under the direction of the Probate Court, to the parties interested.

Section two hundred and thirty-nine of the Act relating to the "estates of deceased persons" prescribes the order in which the debts of the estate shall be paid; and, in case of a deficiency of assets, section two hundred and forty-one provides that, "no creditor of any one class shall receive any payment until all those of a preceding class shall be fully paid." Neither the administrator, nor the Probate Court has any authority to change the order of payments. But the direct effect of the payment of five thousand dollars by the administrator to Jaynes, in pursuance of the order in this case, was to transfer that amount of money from the assets of the estate

of the deceased to the assets of a dissolved, and, perhaps, insolvent partnership. And the result would be to give to the creditors of the partnership a preference to that extent over the creditors of the estate, whereas the law gives the preference, as to that fund, to the creditors of the estate. It would be taking five thousand dollars from the creditors of the estate, and giving it to those who have no claim against the estate unless the surviving partner is insolvent. (*Lawrence* v. *Trustees, etc.,* 2 Denio, 577 ; 11 Paige, 80 ; *Bloodgood* v. *Bruen,* 4 Seld. 362, 369, 371 ; *Voorhis* v. *Childs,* 17 N. Y. 354–357.)

The transfer was made according to the express terms of the order, "for the purpose of liquidating obligations existing against the firm," etc.; that is to say, to pay the debts of the firm in preference to the debts of the estate, in case the estate should turn out to be insolvent, a contingency which seems to be by no means improbable ; and "to offset against a like sum of five thousand dollars to be advanced by said surviving partner and to increase the capital stock of said firm by the gross amount of said sums." Such, at all events, is the result. Whatever powers a Court of equity may, or may not, have upon a proper showing, with the proper parties all before it, to authorize the administrator to use the funds of the estate in an extraordinary manner for the purpose of subserving the interests of the estate, we are clear that such a diversion and misapplication of the assets of the estate, as was made in this case, is beyond the powers of the administrator, and the jurisdiction of the Probate Court ; and if any loss results, it must fall upon the administrator. If the principal sum cannot be allowed, it of course follows that the items of interest paid for the moneys borrowed, and improperly appropriated cannot be allowed. We cannot tell from the state of the record the amount of loss, if any, sustained by the transactions considered.

The fact does not distinctly appear in the record, but we infer from some facts, incidentally stated in the report of the administrator, that the partnership assets have all been absorbed, and that a considerable amount of partnership debts

are still unsatisfied. It seems probable also, but it does not appear otherwise than by inference, that the demands of the contestants are against the firm. If so, and the contestants have availed themselves of the money paid over to the surviving partner under the order of the Probate Court to increase the amount received out of the partnership assets, it would seem to be inequitable that they should also insist upon charging the administrator, and compelling him to pay the sum a second time to enable them to take a second dividend out of the assets of the estate. In this way the contestants would have the benefit of ten thousand dollars when there was really but five thousand dollars belonging to the estate— the administrator, in consequence of his mistake, being chargeable with the other five thousand dollars. Whether the contestants have received any portion of the money thus paid over the record does not disclose.

This case, like that of *Knight's Estate*, is a hard one for the administrator, and it is greatly to be regretted that one who has assumed what is usually a thankless trust, and who seems to have acted in good faith, and in part at least under the sanction of the Probate Court, should, through a mistake as to the extent of his authority and of the powers of the Probate Court, be visited with consequences so severe as seem likely to result to the administrator in this case. But we must administer the law as we find it, irrespective of the hardship of particular cases.

The item of five hundred and thirty-two dollars and three cents, for sundry items paid on account of the estate, was properly allowed.

The record does not disclose facts sufficient to enable us to determine whether the item of eight hundred dollars paid to Hickox was properly allowed or not.

The order appealed from is reversed, and the cause remanded for further proceedings.